**Ronald A. GILLESPIE, Plaintiff,**

v.

**STATE of Wisconsin, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DEPARTMENT OF EMPLOYMENT RELATIONS, Defendants.**

**No. 83–C–530–S.**

United States District Court,
W.D. Wisconsin.

April 13, 1984.

Robert M. Hesslink, Jr., of DeWitt, Sundby, Huggett & Schumacher, Madison, Wis., for plaintiff.

Robert D. Repasky, Asst. Atty. Gen., Madison, Wis., for defendants.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

This is an action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., which seeks declaratory, injunctive and monetary relief on behalf of plaintiff Ronald A. Gillespie and the class of minorities whom he represents.

Although the complaint generally refers to the defendants, Wisconsin Departments of Health and Social Services (DHSS) and Employment Relations (DER) having intentionally engaged in a pattern, policy or practice of discrimination based on race and color in employment opportunities, nonetheless the action is one of disparate impact.

The case was the subject of a bifurcated trial to the Court on March 19–21, 1984, with the understanding that the issue of liability would be first determined by the Court before a determination would be made as to those damages which may have been sustained. All testimony as to both liability and damages was completed on March 21, 1984 and the parties, at the Court's direction, submitted supplemental data pertinent to damages on April 2 and April 3, 1984.

The Court has jurisdiction under both 28 U.S.C. §§ 1343(4) and 1332.

Specifically, the plaintiff claims that the defendants utilized hiring criteria, i.e. written tests, which had a disparate impact on minority job applicants for the positions of Personnel Specialist/Manager, and the tests were not job related.

At the outset the Court will state it has no hesitancy in finding that the written tests did indeed have a disparate impact on plaintiff and the class of minority members which he represents. In final argument, defendants had difficulty in maintaining a contrary position based upon the evidence, which showed that the written examinations for the position of Personnel Specialist/Manager 1 eliminated minorities from further consideration at a statistically higher rate. The Court further finds, with the same degree of certainty, that the tests were job related.

Finally, upon its examination of all the exhibits and testimony offered, the Court is of the opinion that plaintiff has not presented sufficient evidence tending to

show that different tests would not only adequately serve the defendants' interests, but avoid a disparate impact as well.

## FINDINGS OF FACT

1. Plaintiff, Ronald A. Gillespie, is an adult black male citizen of the United States, who was born on June 20, 1948, and who currently resides at 616 Ralph Drive, Raleigh, North Carolina, 27610.

2. Mr. Gillespie was employed with the State of Wisconsin, Department of Health and Social Services as a limited term employee between March of 1979 and September of 1981 as a Personnel Specialist/Manager.

3. In September of 1981 Mr. Gillespie departed from his limited term employment with the State of Wisconsin and became employed as a Personnel Analyst with the Office of State Personnel Local Government Services in the North Carolina State Service.

4. The defendant State of Wisconsin is a sovereign state with its principal place of business at the State Capitol, Madison, Wisconsin.

5. The defendants, Department of Health and Social Services, and the Department of Employment Relations are governmental agencies of the State of Wisconsin, with their principal place of business at One West Wilson Street and 149 East Wilson Street, respectively, Madison, Wisconsin.

6. On July 24, 1980, the plaintiff Ronald Gillespie personally filed charges of unlawful discrimination with the State of Wisconsin Personnel Commission no more than 300 days after the alleged discrimination and causes of action arose as required by Wis.Stat. § 111.36 and filed such charges with the Equal Employment Opportunity Commission (EEOC) within 300 days after the alleged unlawful practice occurred pursuant to Title VII of the Civil Rights Act of 1964, as amended.

7. On March 16, 1981, the State of Wisconsin Personnel Commission issued an initial determination by Robert E. Gregg, Equal Rights Officer, that there was probable cause to believe that discrimination had occurred.

8. On March 7, 1983, the plaintiff, Ronald Gillespie, received the notice of right to sue within 90 days issued by the United States Department of Justice, Herbert A. Goldsmith, Jr., attorney, pursuant to Title VII of the Civil Rights Act of 1964, as amended.

9. This action was commenced within 90 days following receipt of the right-to-sue letter.

10. Wisconsin is a deferral state and the State of Wisconsin Personnel Commission is the state agency empowered to process discrimination charges as they relate to employment by the State of Wisconsin.

11. Prior to January 31, 1980, the plaintiff, Ronald Gillespie, applied for a permanent position with the State of Wisconsin as a Personnel Manager/Specialist.

12. On February 9, 1980, the State of Wisconsin conducted a written examination of applicants for the position of Personnel Manager/Specialist 1 and the plaintiff, Ronald Gillespie, took such examination.

13. As a result of his failure to achieve an adequate score on the written examination, the plaintiff Gillespie was not certified for further consideration for the permanent position of Personnel Manager/Specialist in the Civil Service of the State of Wisconsin.

14. At all times relevant herein, the defendants were employers within the meaning of Title VII of the Civil Rights Act of 1964, as amended.

15. During his period of employment, the plaintiff Gillespie satisfactorily performed the duties of Personnel Specialist/Manager on a limited term basis.

16. The written examination administered to plaintiff and other applicants for the position had a disparate impact by eliminating minorities from further consideration at a statistically higher rate. 451 candidates took the written examination. 403 were white, and 48 were minority group members. 173 white applicants and 11 minority applicants were certified to the second stage.

This indicates that 42.95% of the white applicants passed the written examination and received a chance for further consideration. If minority applicants had been certified at the same rate there would have been 20.6 on the further consideration list. Applying the 80% rule, there should be a permissible number of 16 minority candidates on the list. There were only 11.

Consequently, the plaintiff and class members were not hired for the several positions of Personnel Specialist/Manager 1. The defendants, however, continued to seek and hire other persons for these positions.

17. The position of Personnel Specialist/Manager 1 was posted statewide and was described, in part, as follows:

SKILLS REQUIRED: analytical, organizational and decision making skills; skill in working under pressure and establishing priorities; interpersonal skills to establish and maintain productive working relationships with a wide variety of people in various situations; effective oral and written communication skills. *Wisconsin Residence is Required.*

18. The written test was prepared by employees of DER who had training in test preparation, were familiar with the knowledge, skills and abilities necessary for the position and had personal knowledge of the duties of Personnel Specialist/Manager. Additionally, a job analysis of the position was performed by DER and minority members participated in all of these processes.

19. The written examination administered to all applicants for the positions was developed, among other things, to determine abilities to communicate in standard written English; to prepare basic written position descriptions; to place the analysis of a recruiting problem in an acceptable written form; and to identify fundamental and basic skills which are required to perform duties of the position.

20. All applicants were advised by memorandum from the Department that a written essay examination would be given and that an oral examination would be provided to those most successful. They were advised, among other things, that the examination would consist of three questions designed to measure their analytical and organizational skills, written communication skills, skill in decision making, and skill in working under pressure and setting priorities.

21. The specific questions were not culturally biased. Question 1, related to the position of grounds keeper. It appears to the Court that this reflects the understanding that about half of all United States households have gardens, to include urban gardening plots.

22. The plaintiff Gillespie, in his letter to the Personnel Commission dated March 19, 1980, does not contend that the questions asked were not job related or invalid. Instead, he questioned the scoring methods, qualifications of the raters, and the entire grading process.

23. Plaintiff Gillespie's written examination was rescored by another team, which was unaware of the first scoring. The second result was substantially the same as the first, plaintiff scoring three points lower the second time around.

24. The examination was job related, and it was designed to directly measure specific skills important to job performance.

25. The essay format was utilized as an alternative to multiple choice tests and other types of essay approaches. Concern existed in the Department that the previous tests for Personnel Specialist 1 and Manager 1 given in 1978 or 1979 had an inordinate adverse impact on persons of minority groups.

26. As early as November 29, 1979 meetings were scheduled of job experts for the purpose of recruitment and examination development. A recruitment committee was established, as was an examination committee. Numerous meetings were held by each committee. A number of persons skilled and experienced in personnel management were organized as a group of job experts for the purpose of determining the skill, knowledge and ability essential to the position of Personnel Specialist/Manager.

27. At those meetings discussions were held concerning the tasks to be performed by the Personnel Specialist/Manager. Determinations were made as to those skills, knowledge and ability required to perform those tasks. Further, these job elements were ranked on the basis of their importance to the position, and a weighting was done as it concerns the critical elements. Finally, an examination review and limited pre-testing was conducted to determine that the examination closely approximated the elements of work identified with the position. The written examination selected was content validated.

28. Other alternatives were studied and rejected, including multiple choice, the original in-place test, only essay, only oral, and those others which may be commercially available. Other tests were rejected for several reasons, to include financial, reliability, difficulty in validating, and that they may be the cause of adverse impact.

29. The examination finally adopted contained the questions that the committee believed best tested for the basic skills required in the position.

30. The examination is not to be used again for reasons of security.

31. The plaintiff has failed to show that other tests without a similarly undesirable disparate impact would also serve the defendants' legitimate interest in obtaining qualified applicants for those positions available.

32. Although the highest standard expected by experts with 20/20 hindsight was not obtained for the written test, nonetheless the test procedures utilized were adequate.

33. The content validity procedure is found to be in accordance with EEOC guidelines, and there has been no evidence to indicate that other tests within those guidelines suggested by plaintiff would eliminate the disparate impact and meet the legitimate employment objectives of the defendants.

## MEMORANDUM AND CONCLUSIONS OF LAW

Although after careful discussion, study and deliberation the defendant Departments did not foresee its consequences, nonetheless the written examination provided plaintiff and others resulted in a disproportionate failure rate for minority applicants. The examination, however, was job related.

Plaintiff's claim, of course, does not involve an assertion of purposeful discriminatory motive; instead, that the facially neutral written examination disproportionately excludes minority members from attaining further job certification. The elements of the prima facie case are discussed as follows:

[T]o establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement [has] ... a manifest relationship to the employment in question." *Griggs v. Duke Power Co., supra,* [401 U.S. 424], at 432 [91 S.Ct. 849 at 854 (1971)]. If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Albemarle Paper Co. v. Moody, supra,* [422 U.S. 405], at 425 [95 S.Ct. 2362 at 2375, 45 L.Ed.2d 280 (1975)], quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801 [93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973)].

*Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

Plaintiff has established his prima facie case. The defendants have met their burden by showing the examination to have a manifest relationship to the hiring in question; it is job related. They have done this by demonstrating that the tasks on the

examination substantially represent equivalent tasks on the job. EEOC guidelines appear to provide that evidence of content validity of an employment test may be accepted as evidence of job relatedness for tests that consist of suitable samples of the essential knowledge, skills, or behavior composing the job in question. Here job relatedness is determined where the criteria for selection are clearly identified. The criteria are specific, and the defendants have offered articulable standards to guide the application of these criteria. The Court is of the opinion that the EEOC guidelines were, indeed, followed, and that the examination review phase demonstrated that the examination for the position was significantly correlated with those elements of work behavior identified in the job-analysis phase.

Where it has been determined that the examination was job related, the plaintiff must then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in efficient and trustworthy workmanship." This has not been done. The fact that other tests with more questions may have been available does not satisfy plaintiff's burden. The fact that experts testified that the test and its procedure did not meet the highest standard does not assist plaintiff in meeting his burden, particularly where the test and procedure utilized were adequate.

> Title VII prohibits him [employer] from having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees. To dispel the adverse inference from a prima facie showing under *McDonnell Douglas*, the employer need only "articulate some legitimate, nondiscriminatory reason for the employee's rejection." 411 U.S., at 802 [93 S.Ct., at 1824].
>
> The dangers of embarking on a course such as that charted by the Court of Appeals here, where the court requires businesses to adopt what it preceives to be the "best" hiring procedures, are nowhere more evident than in the record of

this very case. Not only does the record not reveal that the court's suggested hiring procedure would work satisfactorily, but also there is nothing in the record to indicate that it would be any less "haphazard, arbitrary, and subjective" than Furnco's method, which the Court of Appeals criticized as deficient for exactly those reasons. Courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it.

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

Where, as above, the Court cannot require the employer to adopt what it perceives to be the best hiring procedure available, neither can the plaintiff; although, of course, his worthwhile suggestions are to be considered.

Briefly stated, the defendant did not foresee that the test might have a disparate impact on minorities. Where plaintiff has met his prima facie case, the defendants must prove, as they have done here, that the written examination and the attendant procedures were job related. Where this has occurred,

> it remain[ed] open to [Gillespie] to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in "efficient and trustworthy workmanship."

*Dr. Joseph Carpenter v. Board of Regents of the University of Wisconsin System*, 728 F.2d 911 at 914 (7th Cir.1984).

The plaintiff having failed to meet its burden, judgment must be entered in favor of the defendants.

Because the plaintiff has not prevailed in the liability portion of this bifurcated trial, damages cannot be considered.

Accordingly,

### ORDER

IT IS ORDERED that judgment be entered in favor of the defendants DISMISS-

ING the complaint, with prejudice and costs.